CLERK'S OFFICE U.S. DIST. COURT
AT ROANOKE, VA
FILED

JUL 09 2019

JULIA C. DUDLEY, CLERK
BY: [signature]
DEPUTY CLERK

# IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF VIRGINIA
### ROANOKE DIVISION

| | | |
|---|---|---|
| MICHAEL ANTHONY DIEPPA, | ) | CASE NO. 7:18-CV-00455 |
| Plaintiff | ) | |
| | ) | |
| v. | ) | |
| | ) | |
| HAROLD W. CLARKE, et al., | ) | By: Hon. Michael F. Urbanski |
| Defendants | ) | Chief United States District Judge |

## MEMORANDUM OPINION

Michael Anthony Dieppa, currently incarcerated at Green Rock Correctional Center (GROC) and proceeding pro se, complains that defendants violated his constitutional rights and rights under the Religious Land Use and Institutionalized Persons Act, 42 U.S.C. § 2000cc-1 et seq. (RLUIPA). Defendants Harold Clarke and David Robinson, both employees of the Virginia Department of Corrections (VDOC), have filed a motion to dismiss. ECF No. 15. Dieppa responded to the motion to dismiss, making this matter ripe for disposition. For the reasons set forth below, the motion to dismiss is **GRANTED** in part and **DENIED** in part.

## BACKGROUND

### I. Factual Allegations

The following facts, which are taken from Dieppa's complaint, his affidavit, the motion to dismiss, and the attached exhibits, are accepted as true for purposes of the defendants' motion.[1] Dieppa is a follower of Celtic Druidry. Defendant Harold Clarke is the director of

---

[1] See Canady v. Hodges, No. 7:17CV00464, 2018 WL 3146792 (W.D. Va. 2018) (construing additional facts in pro se response as amendments to complaint) and Scates v. Doe, No. 6:15-2904-MFS-KFM, 2016 WL 8672963 (D.S.C. 2016) (noting that in evaluating a motion to dismiss, courts evaluate the complaint in its entirety, including documents that are integral to and relied on in the complaint when there is no question as to their authenticity).

VDOC and Defendant A. David Robinson is the VDOC Chief of Operations. Celtic Druidry "is a polytheistic, non-dualistic, non-sexist, non-racist, scientific, holistic, and ecologically oriented faith embracing peacefulness and 'the love of ALL existences.'" ECF No. 1 at 3. A core tenet of Druidry is that "the divine is experienced through direct connection and communion with nature." Id. Druids exercise their religion in a "sacred space developed by the collection and invocation of the elements and the gods." Id. Religious practice requires the presence of the elements of earth, air, water, and fire. ECF No. 1-1 at 3-4. Without all four elements, "a sacred space cannot properly be established" and adherents are prevented from meaningful worship and religious practice. ECF No. 1-1 at 4.

The VDOC follows Operating Procedure (OP) 841.3 to provide offenders the opportunity to practice their religions. ECF No. 16-1 at 5. Offenders have access to group religious services and VDOC designates space and either a paid or volunteer chaplain who serves as an advocate for equitable accommodation of all religious faiths. Id. at 16-1 at 5-19. Religious services are subject to monitoring and other security measures in accordance with requirements for the orderly operation and safety of the offender population. Id. at 8. Communal religious property used in religious services must comply with all department and facility procedures relating to contraband. Communal faith items are stored in a secure area of the facility and made available to offenders during approved worship times. Id. at 15.

In addition to communal faith items, offenders may submit requests for personal faith objects at the institutional level and the facility head or designee reviews the requests and makes a recommendation for approval or denial. Id. at 9. Requests are then sent to the Faith Review Committee (FRC), a panel of representative VDOC staff, for review. Id. The FRC's

recommendations are "referred to the Chief of Corrections Operations . . . for review and approval prior to notifying facilities of changes." Id. at 14. If approved, the requested item is added to the list of Approved Religious Items, available for offenders throughout VDOC. Id. at 9. If the FRC has reviewed a request for a particular item within the past twelve months, no new review is required – the prior decision can be applied to all repeated requests. Id.

VDOC allows offenders to observe holy days where called for by their religions. However, levels of offender participation and the availability of facility resources and religious leaders does not permit separate services for every possible form of worship at every facility. Id. at 12. VDOC has a "Master Religious Calendar" that it uses as a guide for planning holy days and religious observations. Id. and ECF No. 18-3 at 7-11.

Pursuant to OP 841.3, Dieppa requested several "specific and required religious items for personal use." ECF No. 1 at 4. Dieppa requested a wooden wand, a tea candle, an oil diffuser, a small bell, an offering bowl, and an outdoor area with a fire pit (Aff. of Bernard Morris, ¶ 11; ECF No. 16-1). The Facility Unit Head recommended disapproval of all the requests and the FRC reviewed and denied all the requests on September 14, 2017. ECF No. 1 at 5.

Dieppa's request for a wooden wand specified that it was an "integral, necessary staple of [his] religion used for "healing, harmony, peace, and cleansing." ECF No. 1-2 at 9. The Facility Unit Head recommended approval of the wand for communal use only, noting that the facility already allowed drum sticks. Id. Another group was permitted to use these drumsticks, which are similar to a wand in shape and material, in their religious practices. ECF

No. 1 at 6. Despite the recommendation for approval, the FRC disapproved the request based on "safety and security; potential weapon." Id.

Dieppa's request for a tea candle indicated that the candle fulfilled the requirement of fire in his sacred space. ECF No. 1-2 at 10. The Facility Unit Head recommended disapproval based on security and safety concerns related to the open flame. Id. The FRC's basis for denying the request was "safety and security (fire hazard) & could mask odors (drugs, etc.)." Id.

Dieppa requested an oil diffuser because his "prayers and invocations are not properly carried to the gods without it." ECF No. 1-2 at 11. The Facility Unit Head recommended disapproval as staff is not permitted this item. The FRC denied the request due to "safety and security (fire hazard) & could mask odors (drugs, etc.)." Id.

Dieppa requested a wooden or metal offering bowl for daily use. ECF No. 1-2 at 12. He indicated that plastics and man-made materials are unacceptable as they are "offensive to [him] and [his] deities." Id. For this reason, the plastic bowls sold by VDOC are not acceptable for religious use. ECF No. 1 at 7. The Facility Unit Head recommended disapproval as the item is already approved for communal use. ECF No. 1-2 at 12. The FRC found that a blessing bowl was already approved as a communal item and denied the request. Id.

Dieppa requested a small bell, indicating it is "required in [his] religious practices . . . to clear [his] sacred space of unwanted negative energies and spirits" and can be used to "call deities to [his] sacred space." ECF No. 1-2 at 13. The Facility Unit Head recommended disapproval due to the "burden of keeping track of another metal object in the facility." Id. The FRC denied the request due to "safety & security (potential weapon)." Id.

Finally, Dieppa requested an exterior worship area with a fire pit to use as part of approved holiday celebrations. ECF No. 1-2 at 14. The Facility Unit Head recommended disapproval and the FRC denied the request due to "security & safety issue with fire inside the compound." Id.

In addition to Dieppa's requests, two other offenders made requests related to Druidry. Offender William Graham requested plant-based essential oils and a chalice. The Facility Unit Head recommended approval of oils, but it was denied by the FRC because the "already approved oils are deemed adequate. Cedarwood is already approved." ECF No. 1-2 at 7. Graham's request for a chalice was not approved, with the Facility Unit Head saying it was not a reasonable request for personal use and the FRC finding it was a safety and security risk because it could be used as a weapon. ECF No. 1-2 at 8. Offender Fields requested recognition of six Druid holy days, but the request was denied because two holy days, Samhain and Beltane, already were recognized. ECF No. 1-1 at 7-8; Morris Aff. ¶ 12, ECF No. 16-1 at 3.

Dieppa appealed the denials of all the objects and the holy days through the administrative process. ECF Nos. 1 at 6; 1-2 at 2-6. Defendant Robinson upheld the FRC's decisions regarding the objects and holy days on December 4, 2017 and notified Dieppa that he had exhausted all administrative remedies. ECF No. 1-2 at 6.

## II. Causes of Action

Dieppa claims that (1) defendants violated his rights under the First Amendment and RLUIPA by denying him possession of certain holy items, including the essential oils, chalice, wooden wand, candle, oil diffuser, small offering bowl, and small bell; (2) defendants violated his rights under the First Amendment and RLUIPA by denying him recognition of certain

holy days; and (3) defendants violated his right to equal protection under the Fourteenth Amendment by denying Druidry's holy days while approving the holy days of other religions. Dieppa seeks injunctive relief mandating approval of the requested religious items and holy days, declaratory relief that his rights were violated, and $50,000.00 in punitive damages from each defendant.

In their motion to dismiss, defendants argue (1) Dieppa lacks standing to bring claims for the items and holy days he did not personally request; (2) Dieppa has failed to state a claim for relief because he has not stated facts showing that defendants have substantially burdened his faith under RLUIPA and the First Amendment, and (3) Dieppa failed to allege the personal involvement of either Defendant necessary to sustain a claim under § 1983.

## APPLICABLE LAW

### I. Motion to Dismiss Pursuant to Rule 12(b)(1)

Defendants move to dismiss Dieppa's claims under Rule 12(b)(1) of the Federal Rules of Civil Procedure, asserting that he lacks standing to sue on some of his claims. See Payne v. Chapel Hill North Properties, LLC, 947 F.Supp.2d 567, 572 (M.D.N.C. 2013) (noting that challenges to standing are addressed under Rule 12(b)(1) for lack of subject matter jurisdiction).

There are two strands of standing: constitutional and prudential. Doe v. Virginia Dept. of State Police, 713 F.3d 745, 753 (4th Cir. 2013). Article III of the Constitution permits federal courts to adjudicate only "actual cases and controversies." Allen v. Wright, 468 U.S. 737, 750 (1984). The constitutional standing doctrine gives effect to this requirement by "ensur[ing] that a plaintiff has a sufficient personal stake in a dispute to render judicial resolution

appropriate." Friends of the Earth, Inc. v. Gaston Copper Recycling Corp., 204 F.3d 149, 153 (4th Cir. 2000) (en banc). To establish constitutional standing, a plaintiff must have (1) suffered an injury-in-fact that is (a) concrete and particularized and (b) actual or imminent; (2) the injury must be fairly traceable to the challenged action of the defendant; and (3) the injury must be likely to be redressed by a favorable decision. Lujan v. Defenders of Wildlife, 504 U.S. 555, 560-61 (1992).

The party invoking federal jurisdiction generally "bears the burden of establishing these elements." Id. at 112. However, documents filed pro se are liberally construed and this extends to standing. Erickson v. Pardus, 551 U.S. 89, 94 (2007). See Gould v. Schneider, 448 F. App'x 615, 618 (7th Cir. 2011) (explaining that a district court may liberally construe a pro se litigant's factual allegations pertaining to standing) and Lerman v. Bd. Of Elections in City of New York, 232 F.3d 430, 437 (7th Cir. 1998) ("[T]he obligation to read the pleadings of a pro se plaintiff liberally and interpret them to raise the strongest arguments that they suggest . . . extends to the question of standing no less than it does to any other issue." (internal quotation marks and citations omitted)).

Prudential standing serves "judicially self-imposed limits on the exercise of federal jurisdiction." Allen, 468 U.S. at 751. The doctrine encompasses "the general prohibition on raising another person's legal rights, the rule barring adjudication of generalized grievances more appropriately addressed in the representative branches, and the requirement that the plaintiff's complaint fall within the zone of interests protected by the law invoked." Id.

Defendants allege that Dieppa lacks both constitutional and prudential standing to bring claims related to the plant-based essential oils, the chalice, and the holy days because he

did not personally request those items and did not request the holy days to which he now claims he and the other Druids are entitled. As set out above, Offender Graham requested the chalice and the plant-based oils, while Offender Fields sought recognition of the six holy days. Dieppa responds that because Robinson upheld the denial of these religious items and holy days, Dieppa is prevented from practicing his religion in violation of RLUIPA, the First Amendment, and the Fourteenth Amendment.

The court finds that Dieppa has constitutional standing because he has a personal stake in the outcome of this litigation. He alleges that he needs the requested items in order to practice his religion and it is uncontested that VDOC has declined to add the items requested by Dieppa and Graham to the list of approved faith items. To the extent defendants are asserting that Dieppa failed to exhaust his administrative remedies, their assertion is foreclosed by defendant Robinson's final response to Dieppa's grievances, where he stated that he had reviewed Dieppa's grievance of the FRC's decision to disapprove his request for religious items and additional holy days. Robinson determined that the grievance was unfounded and stated that Dieppa had exhausted all administrative remedies. ECF No. 1-2 at 6.

Moreover, the FRC is not required to review repeat requests for individual faith items for twelve months following its initial decision. ECF No. 16-1 at 9. Thus, the denial of Graham's request effectively foreclosed Dieppa's ability to seek FRC approval for a year. The denial of items Dieppa claims are required for his religious practice, even though requested by Graham, constitutes a concrete and particularized injury-in-fact. A favorable decision would redress Dieppa's injury by enabling Dieppa to access these items through the Approved Religious Items list. Constitutional standing therefore is satisfied.

The same analysis applies to Dieppa's claim that denial of the holy days places a substantial burden on the practice of his religion. That Fields rather than Dieppa requested the holy days does not change the fact that the holy days are not recognized by VDOC. Accordingly, Dieppa has constitutional standing to bring both of these claims.

Second, Dieppa also has prudential standing. Defendants claim that Dieppa is attempting to bring claims on behalf of Graham and Fields rather than himself. However, Dieppa's complaint makes clear that he is seeking the items so that he can "meaningfully practice his religion." ECF No. 1 at 8. While he does discuss the items in terms of himself and others who practice the religion, nowhere in his pleadings does he appear to be bringing claims on behalf of anyone but himself. Also, if approved, the plant-based essential oils and chalice would have been placed on the Approved Religious Items list and made available to all VDOC offenders, including Dieppa. While prudential standing generally "prohibits raising another person's legal rights," the court understands Dieppa to be seeking relief for injuries he himself has suffered. Allen, 468 U.S. at 751. Dieppa has satisfied the court that he has standing to bring these claims.

## II. Motion to Dismiss Pursuant to Rule 12(b)(6)

To survive a motion to dismiss under Federal Rule of Civil Procedure 12(b)(6), a complaint must contain sufficient factual allegations, which, if accepted as true, "'state a claim to relief that is plausible on its face.'" Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009) (quoting Bell Atl. Corp. v. Twombly, 550 U.S. 544, 557 (2007)). Under the plausibility standard, a complaint must contain "more than labels and conclusions" or a "formulaic recitation of the elements of a cause of action." Twombly, 550 U.S. at 555. This plausibility

standard requires a plaintiff to demonstrate more than "a sheer possibility that a defendant has acted unlawfully." Iqbal, 556 U.S. at 678.

When ruling on a motion to dismiss, the court accepts "the well-pled allegations of the complaint as true" and "construe[s] the facts and reasonable inferences derived therefrom in the light most favorable to the plaintiff." Ibarra v. United States, 120 F.3d 472, 474 (4th Cir. 1997). While the court must accept as true all well-pleaded factual allegations, the same is not true for legal conclusions. "Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." Iqbal, 556 U.S. at 678. A court need not accepts as true "'legal conclusions, elements of a cause of action, . . . bare assertions devoid of further factual enhancement, . . . unwarranted inferences, unreasonable conclusions, or arguments.'" Richardson v. Shapiro, 751 F. App'x 346, 348 (4th Cir. 2018) (quoting Nemet Chevrolet, Ltd. v. Consumeraffairs.com, Inc., 591 F.3d 250, 255 (4th Cir. 2009)) (internal quotation marks omitted). Thus, a complaint must present sufficient nonconclusory factual allegations to support a reasonable inference that the plaintiff is entitled to relief and the defendant is liable for the unlawful act or omission alleged. See Francis v. Giacomelli, 588 F.3d 186, 196-197 (4th Cir. 2009) (affirming dismissal of claim that simply stated a legal conclusion with no facts supporting the allegation) and King v. Rubenstein, 825 F.3d 206, 214 (4th Cir. 2016) ("Bare legal conclusions 'are not entitled to the assumption of truth' and are insufficient to state a claim.") (quoting Iqbal, 556 U.S. at 679).

A. RLUIPA Claims

As an initial matter, a prisoner bringing a cause of action under RLUIPA is not entitled to money damages against state defendants in either their individual or official capacities.

Sossamon v. Texas, 563 U.S. 277, 293 (2011). Thus, Dieppa is limited to seeking only injunctive relief under RLUIPA. Bayadi v. Mathena, No. 7:12-cv-436, 2013 WL 819735, at *6 (W.D. Va. 2013).

Defendants assert that Dieppa has failed to state a claim under both RLUIPA and the First Amendment. With regard to prison inmates, RLUIPA provides the following:

(a) General rule

No government shall impose a substantial burden on the religious exercise of a person residing in or confined to an institution . . . even if the burden results from a rule of general applicability, unless the government demonstrates that imposition of the burden on that person—

(1) is in furtherance of a compelling government interest; and

(2) is the least restrictive means of furthering that compelling government interest.

42 U.S.C. § 2000cc-1(a).

RLUIPA claims are analyzed under the strict scrutiny standard and are to be construed "'in favor of broad protection of religious exercise.'" Lovelace v. Lee, 472 F.3d 174, 186 (2006) (quoting 42 U.S.C. § 2000cc-3(g)). The inmate bears the initial burden of showing that a prison's policy creates a substantial burden on his religious exercise. If he makes such a showing, the burden shifts to the defendant to show that its policy furthers a compelling state interest by the least restrictive means. 42 U.S.C. § 2000cc-2 (b); Incumaa v. Stirling, 791 F.3d 517, 525 (4th Cir. 2015).

Although the statute does not define "substantial burden," the Supreme Court has defined the term in the context of the free exercise clause as "putting substantial pressure on an adherent to modify his behavior and violate his beliefs," Thomas v. Review Bd. Of Ind. Employment Sec. Div., 459 U.S. 707, 718 (1981), or "one that forces a person to 'choose

between following the precepts of her religion and forfeiting [governmental] benefits, on the one hand, and abandoning one of the precepts of her religion . . . on the other hand.'" Lovelace, 472 F.3d at 187 (quoting Sherbert v. Verner, 374 U.S. 398, 404 (1963)); Krieger v. Brown, 496 F. App'x 322, 325 (4th Cir. 2012). Government action does not create a substantial burden if it makes the religious exercise more expensive or difficult, as long as it does not pressure the adherent to violate his or her religious beliefs or abandon one of the precepts of the religion. Al-Azim v. Everett, No. 3:14CV339, 2017 WL 1097219, at * 3 (E.D. Va. 2017) (citing Living Water Church of God v. Charger Twp. Of Meridian, 258 Fed. Appx. 729, 739 (6th Cir. 2007)).

Regarding the "least restrictive means," the standard is "exceptionally demanding," and it requires the government to "'sho[w] that it lacks other means of achieving its desired goal without imposing a substantial burden on the exercise of religion by the objecting part[y].'" Holt v. Hobbs, 135 S.Ct. 853, 864 (2015) (quoting Burwell v. Hobby Lobby Stores, Inc., 573 U.S. 682, 728 (2014)) (alterations in original). Courts must "'scrutiniz[e] the asserted harm of granting specific exemptions to particular religious claimants' and 'look at the marginal interest in enforcing' the challenged government action in that particular context.'" Holt, 135 S.Ct. at 863 (quoting Hobby Lobby, 573 U.S. at 726-727 and Gonzales v. O Centro Espirita Beneficente Unio do Vegetal, 546 U.S. 418, 431(2006)) (alteration in Hobby Lobby).

However, RLUIPA does not "elevate accommodation of religious observances over an institution's need to maintain order and safety." Cutter v. Wilkinson, 544 U.S. 709, 722 (2005). Security in a prison setting is a compelling state interest and security concerns deserve particular sensitivity. Lovelace, 472 F.3d at 190 (citing Cutter, 544 U.S. at 722).

## (1) Substantial Burden

As Dieppa alleges that each of the requested items is to be used during religious exercise, the only issue is whether the denial of these items constitutes a substantial burden on his ability to practice his religion. To make that showing, Dieppa must demonstrate that the lack of these items places substantial pressure on him to modify his behavior and violate his beliefs. Krieger, 496 F. App'x at 325. A blanket assertion that a religious item is required is insufficient. At a minimum, a free exercise claim under RLUIPA requires an explanation of why the absence of a specific religious item imposes a substantial burden on religious practice. See Id. at 326.

For this reason, Dieppa's request for an outdoor worship area fails to state a claim under RLUIPA. Dieppa repeatedly alleges that his religious practices "should" be performed outdoors. ECF 1-1 at 3, 5. Dieppa's request for an outdoor worship space echoes Krieger, where an inmate asserted that his religious practice was "best performed outdoors" and requested an outdoor worship space in which to practice. Krieger, 496 F. App'x at 325. The court found that Krieger "failed to offer any explanation regarding the reason why indoor worship would compromise his religious beliefs." Id. at 325. Similarly, Dieppa has not provided any basis for the court to conclude that the denial of an outdoor worship area substantially burdens his religious exercise and therefore, the defendants' motion to dismiss this claim is granted and the claim is dismissed.

Dieppa's claim regarding specific holy days also fails to state a claim under RLUIPA. Dieppa states only that his religion has eight annual holy observances, that certain rituals must be performed during those observances, and that the FRC denied recognition of these holy

13

days. He fails to state how the denial imposes a substantial burden on his religious practice and why he cannot observe these holy days independently. Compare Miles v. Guice, 688 F. App'x 177, 178-179 (4th Cir. 2017) (remanding to district court after finding that failure to accommodate fasting on holy days is a substantial burden); and Lovelace, 472 F.3d at 187 (removing inmate from Ramadan observance pass list caused him to be unable to fast, meaning he could not fulfill one of the five pillars or obligations of Islam). Accordingly, Dieppa's RLUIPA claim based on the denial of Druid holy days (other than the two that are recognized) is dismissed for failure to state a claim.

The requests for specific personal items require further consideration. To state a claim for deprivation of religious objects, Dieppa must allege that the prison denied him items necessary for specific, required, religious practices and that the absence of those items modified his behavior and violated his religious beliefs. See Blankenship v. Setzer, 681 F. App'x 274, 277 (4th Cir. 2017); Krieger, 496 F. App'x at 326. The prison in Blankenship substantially burdened the inmate's religious practice because the inmate "asserted that his religion requires him to read and study the bible daily" and therefore the "deprivation of a Bible for longer than a period of 24 hours forced him to modify his behavior and violate his religious beliefs . . .") Blakenship, 671 F. App'x at 277. Conversely, in Krieger, the inmate's failure to explain why "the absence of sacred items had an impact on the rituals and violated his beliefs[]" prevented the court from effectively evaluating whether the restriction posed a substantial burden. Krieger, 496 F. App'x at 326.

Like the prisoner in Blankenship, Dieppa asserts that the plant-based essential oils, chalice, offering bowl, wooden wand, tea-light candle, oil diffuser, and small bell are required

for specific components of his daily religious practice. He describes the purpose of each item and claims that their absence prevents his relationship with the divine. Therefore, just as the deprivation of the Bible in <u>Blankenship</u> forced the inmate to disobey the requirement of daily Bible study, the deprivation of these objects prevents Dieppa from completing his required daily practices.

The Defendants argue that Dieppa's complaint only alleges that his practice of Druidism requires the presence of the four elements and does not require the use of a single, specific item to invoke the elements. They suggest that to invoke the element of air, Dieppa does not need an oil diffuser, but can blow or whistle. Rather than needing a bowl made out of natural materials, he could use his hands or leaves to hold water. To invoke fire, he could use a picture of fire, or create a makeshift fire by shaping wood and leaves built to look like a campfire. Rather than using a bell, defendants suggest he could make similar sounds with his mouth, lips, or hands. ECF No. 16 at 10.

However, this argument ignores critical portions of Dieppa's complaint. The court understands Dieppa to complain that his religious practices have two intersecting but separate requirements – the presence of all four elements *and* the specific items at issue here. Dieppa's affidavit suggests that the elemental representations may vary, while the specific items may not. Thus, notwithstanding defendants' suggested alternatives, the court finds that Dieppa has stated a claim that not being allowed the items places a substantial burden on his religious practices.[2]

---

[2] Dieppa's claims relating to essential oils and a chalice and bowl made of natural materials echo requests addressed by other courts. In <u>LaPlante v. Mass. Dept. of Corr.</u>, 89 F. Supp. 3d 235, 245 (D. Mass. 2015), the court found that limiting the types of ritual oils available placed a substantial burden on religious exercise.

**(2) Least Restrictive Means**

Under RLUIPA, the burden shifts to defendants to show that VDOC's policies further its compelling state interest in safety and security by the least restrictive means. Holt, 135 S.Ct. at 853; Cutter, 544 U.S. at 722; Lovelace, 472 F.3d at 190.

The candle requested by Dieppa for use in his cell clearly poses a danger to himself and the facility. "The need to prevent inmates' access to fire within living areas is an obviously justifiable reason to maintain institutional security and discipline and prevent threats to inmates' safety." De'lonta v. Johnson, No. 7:11-CV-175, 2012 WL 2921762, at *10 (W.D. Va. 2012) (citing Davis v. Or. County, 607 F.3d 543 (8th Cir. 2010)). See also Ward v. Walsh, 1 F.3d 873, 879 (9th Cir. 1993) (finding in pre-RLUIPA case that "serious safety and security concerns raised by allowing inmates to possess and use candles outweighs the curtailment of [the petitioner's] religious practice.")

VDOC has an "open flame candles" policy which provides that candles may be used during designated events and requires that a staff member with a radio and fire extinguisher remain in the area while candles are lit. ECF No. 18-3 at 12. The court finds that allowing Dieppa to use candles at designated events with precautions in place is the least restrictive means for allowing him to practice his religion and that the denial of a candle in his cell does not state a claim under RLUIPA.

---

Similarly, the court in Levie v. Ward, No. CIV-05-1419-HE, 2007 WL 2840388, at *16 (W.D.Okla. Sept 27, 2007), found that a policy limiting Wiccan prisoners to five kinds of oils was a substantial burden under RLUIPA, given that prayers are "rendered . . . pointless" without the correct oils. Other courts have found that allowing only plastic alternatives for religious items, when the inmate's religion requires natural substances and disavows plastics, imposes a substantial burden. See Warner v. Patterson, No. 2:08-CV-519 TC, 2011 WL 5117917, *10 (D. Utah Oct. 27, 2011).

Regarding the use of an oil diffuser, VDOC denied the request because it creates a fire hazard and also because it could mask other odors such as drugs. The court finds that the prohibition on an in-cell oil diffuser furthers VDOC's compelling interest in keeping illegal drugs out of the facility and is the least restrictive means of doing so. Thus, Dieppa cannot state a claim based on the denial on an in-cell oil diffuser.

Dieppa's request for a wand in his cell was denied by the Facility Unit Head with the recommendation that it be allowed for communal use only. It was noted that drumsticks were allowed, presumably in a communal setting. The FRC denied the request to have a wand even in a communal setting, because it could be used as a weapon. ECF No. 1-2 at 9. Dieppa points out that a Christian group is allowed to use musical instruments, including a drum set, for their twice weekly worship service. However, he does not claim that individual inmates are allowed to have drumsticks in their cells. The court finds that the denial of a wand for in-cell personal use is consistent with VDOC's safety concerns.

Nevertheless, given that the Christian group is allowed drumsticks in a communal setting, it does not appear that banning wands entirely is the least restrictive means of ensuring safety. Limiting possession of a wand to a communal setting would further VDOC's safety concerns while allowing Dieppa and the other Druids to practice their religion. Accordingly, defendants have failed to meet their burden under RLUIPA of showing that denial of the use of a wand in a communal setting is the least restrictive means of furthering the interest of safety in the institution. See Martinez v. Richardson, No. 6:15-cv-732, 2017 WL 9289644 (E.D. Tex. 2017) (noting that a wand was allowed in a communal setting when it was brought in by an approved volunteer and removed immediately after the service).

Regarding in-cell possession of a wooden or metal chalice, Robinson denied the request because of the potential to use it as a weapon. The chalice requested was three-and-a-half inches tall. VDOC inmates are allowed to have a six-inch by eight-inch wooden plaque depicting an icon in their cells, which presumably also could be fashioned into a weapon. ECF No. 18-3 at 5. Allowing the plaques undermines the defendants' contention that a small chalice should be disallowed because it could be used as a weapon as both items have some potential to be used as weapons. See also Kempvanee v. Skolnik, No. 3:10-cv-535, 2012 WL 893776 (D. Nev. 2012) (noting that prisoner had chalice made of unspecified material in his cell). Thus, the court finds that defendants have not met their burden under RLUIPA with regard to denying Dieppa the use of a small chalice in his cell.

For the same reasons, defendants' concerns about safety related to Dieppa's request for a two-inch tall bell measuring three inches at the base do not appear consistent with other items that are allowed, such as one-and-a-half-inch metal amulets, medallions, and pendants. ECF No. 18-3 at 4. Some prisons routinely allow bells in cells. See Maier v. Swanson, No. CV-08-26-H-DWM, 2009 WL 1439477, *3 (D. Mont. 2009); but see Smith v. Stoley, No. 1:08-cv-693, 2009 WL 3233825 (W.D. Mich. 2009) (finding that rule disallowing in-cell bell because it could be used to signal other prisoners did not violate rights under RLUIPA). While almost any object could be fashioned into a weapon, a small bell does not seem more likely than an amulet or medallion to be dangerous. Accordingly, defendants have not met their burden under RLUIPA in denying Dieppa personal use of a small bell.

Dieppa's request for a small offering bowl was denied because a blessing bowl already is approved for communal use. Dieppa asks for either a wooden bowl measuring five inches

by two inches by one-and-a-half inches, or a three-inch metal bowl that he can use daily to hold offerings to his deities. ECF No. 1-2 at 12. It is unclear whether a blessing bowl is the same thing as an offering bowl or if there is a safety or security risk in allowing an inmate to have a small wooden or metal bowl in his cell. Accordingly, defendants have not met their burden of showing that the denial of an offering bowl for personal religious purposes is the least restrictive means of furthering a compelling government interest.

Finally, the request for plant-based essential oils was denied because the already approved oils are deemed adequate, and because cedar wood oil in particular already is approved. ECF No. 1-2 at 7. Inmates are allowed to have prayer oil for personal use in a one-ounce clear plastic bottle and the allowed oils include sage, rosemary, sweet grass, lemongrass, cedar wood, eucalyptus, sandalwood, frankincense, myrrh, jasmine, wiccan ritual oil, and generic oil. ECF No. 18-3 at 5. Dieppa objects to these oils because they are man-made rather than plant-based. ECF No. 1-1 at 4-5. Accepting as true that the prayer oil needs to be made of plant essences "to draw the blessings of the god/goddess," disallowing plant-based oil does not seem to further a compelling government interest, much less to do so in the least restrictive manner. For this reason, the defendants' motion to dismiss is denied with regard to plant-based essential oils.

In sum, defendants' motion to dismiss is granted with regard to Dieppa's RLUIPA causes of action based on the need to practice his religion outside; the need for six additional Druid holy days; the need for a candle in his cell; and the need for personal or communal use of an oil diffuser. However, at this stage of the litigation, defendants have not met their burden under RLUIPA of showing that denial of Dieppa's requests to use a chalice, bell, offering

bowl, and plant-based essential oils in his cell is the least restrictive means of furthering a compelling government interest. Nor have defendants met their burden with regard to the communal use of a wand. Accordingly, the defendants' motion to dismiss Dieppa's RLUIPA claims is denied with regard to these items.

## B. Liability under 42 U.S.C. § 1983

To prevail on a claim for a civil rights violation under 42 U.S.C. § 1983, a plaintiff must establish (1) that he has been deprived of a right, privilege, or immunity secured by the Constitution or laws of the United States and (2) that the conduct about which he complains was committed by a person acting under color of state law. Dowe v. Total Action Against Poverty in Roanoke Valley, 145 F.3d 653, 658 (4th Cir. 1998). Plaintiffs may seek money damages against defendants for their official actions when they are sued in their individual capacities, subject to some exceptions and immunities. Hafer v. Melo, 502 U.S. 21, 30-31 (2001)

Claims for money damages brought against defendants in their official capacities are not cognizable in § 1983 lawsuits because neither a state nor its officials acting in their official capacities are persons for purposes of § 1983. Will v. Michigan Dep't of State Police, 491 U.S. 58, 71 (1989). Thus, a claim brought against a person in his or her official capacity is considered a suit against the official's office. Because the Eleventh Amendment prohibits courts from entertaining an action against the state, Alabama v. Pugh, 438 U.S. 781, 782 (1978), it also prohibits courts from considering claims against defendants in their official capacities. Cromer v. Brown, 88 F.3d 1315, 1332 (4th Cir. 1996).

However, a plaintiff may seek prospective injunctive relief against state defendants in their official capacities. Will v. Michigan Dept. of State Police, 491 U.S. 58, 71 (1989); Graham v. Kentucky, 473 U.S. 159, 167 n. 14 (1985). "To ensure enforcement of federal law . . . the Eleventh Amendment permits suits for prospective injunctive relief against state officials acting in violation of federal law." Frew ex rel. Frew v. Hawkins, 540 U.S. 431, 437 (2004).

Defendants may assert qualified immunity against § 1983 claims brought against them in their personal capacities. The doctrine of qualified immunity affords protection against individual liability for civil damages to officials insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known. Pearson v. Callahan, 555 U.S. 223, 231 (2009) (quoting Harlow v. Fitzgerald, 457 U.S. 800, 818 (1982)). Stated another way, "[q]ualified immunity protects officials 'who commit constitutional violations but who, in light of clearly established law, could reasonably believe that their actions were lawful.'" Booker v. South Carolina Dept. of Corrections, 855 F.3d 533, 537-538 (4th Cir. 2107) (citing Henry v. Purnell, 652 F.3d 524, 531 (4th Cir. 2011) (en banc)). The doctrine weighs the need to hold public officials accountable for irresponsible exercise of power against the need to shield officials from harassment, distraction, and liability when they perform their duties responsibly. Booker, 855 F.3d at 538 (citing Pearson, 555 U.S at 231).

In performing a qualified immunity analysis, a court must first determine the specific right that the plaintiff alleges was infringed by the challenged conduct. Id. (citing Winfield v. Bass, 106 F.3d 525, 530 (4th Cir. 1997) (en banc)). The court then must ask whether a constitutional violation occurred and whether the right violated was clearly established at the time the official violated it. The questions need not be asked in a particular order. Id. (citing

Melgar ex rel. Melgar v. Greene, 593 F.3d 348, 353 (4th Cir. 2010) and Pearson, 555 U.S. at

236). The plaintiff bears the burden of showing that a constitutional violation occurred, while

the defendant bears the burden of showing entitlement to qualified immunity. Purnell, 501

F.3d at 377.

**(1) Liability of Clarke and Robinson**

Defendant Clarke is the Director of VDOC and Robinson is the Chief of Corrections

Operations at VDOC, as defendants in this case. A valid § 1983 claim must state that "each

Government-official defendant, through the official's own actions, has violated the

Constitution." Ashcroft, 556 U.S. at 676. Defendants argue that the actions identified in

Dieppa's complaint were taken by the FRC and that neither Clarke nor Robinson had the

requisite personal involvement. This is true for Clarke, as he is not referenced in the complaint

outside the caption. Therefore, all claims against Clarke are dismissed.

However, Robinson, as the Chief of Correctional Operations, is responsible for

reviewing and making a final decision regarding FRC recommendations. See OP 841.3 IV.D.5

("Faith Review Committee recommendations shall be referred to the Chief of Corrections

Operations and Corrections Operations Administrator for review and approval prior to

notifying facilities of changes.") In this capacity, Robinson's involvement is similar to the

involvement of the prison warden in King v. Rubenstein, 825 F.3d 206, 223 (4th Cir. 2016).

There, the court found that an inmate stated a claim against a warden who over-turned a

decision of the administrative segregation committee to return the inmate plaintiff to the

general population. Id. at 218-219. See also Smart v. Goord, 441 F.Supp.2d 631 at 643-44

(S.D.N.Y 2006) (finding superintendent's "ultimate authority" to determine whether to accept

or reject the review committee's recommendation regarding administrative segregation was sufficient personal involvement to sustain a § 1983 action). Taking all of the facts alleged in the complaint and supporting documents as true, Dieppa states sufficient personal involvement by Robinson to satisfy a § 1983 claim against him in his individual and official capacities.

**(2) First Amendment**

Inmates retain protections provided by the First Amendment, including its directive that no law shall prohibit the free exercise of religion. O'Lone v. Estate of Shabazz, 482 U.S. 342, 348 (1987). Nevertheless, inmates' rights are evaluated in the context of their incarceration and courts accord deference to prison officials. Lovelace, 472 F.3d at 199. "[W]hen a prison regulation impinges on inmates' constitutional rights, the regulation is valid if it is reasonably related to legitimate penological interests. In our view, such a standard is necessary if 'prison administrators …, and not the courts, [are] to make the difficult judgments concerning institutional operations.'" Turner v. Safley, 482 U.S. 78, 89 (1987) (quoting Jones v. North Carolina Prisoners' Union, 433 U.S. 119, 128 (1977)). Thus, the First Amendment affords fewer protections to inmates' free exercise rights than does RLUIPA. Lovelace, 472 F.3d at 199-200.

The first stage of the analysis of a free exercise claim is essentially the same for claims under both RLUIPA and the First Amendment. Wright v. Lassiter, 921 F.3d 413, 418 (4th Cir. 2019); See, e.g., Carter v. Fleming, 879 F.3d 132, 139 (4th Cir. 2018) (finding that to state a claim under the free exercise clause, an inmate "must demonstrate that: (1) he holds a sincere religious belief; and (2) a prison practice or policy places a substantial burden on his ability to

practice his religion"). Accordingly, the court finds that Dieppa has stated a First Amendment claim that the denial of the religious items he requested for his personal use placed a substantial burden on his ability to practice his religion, but finds that Dieppa has failed to state a claim based on the denial of Druid holy days or the need to hold religious services outside.

Under the free exercise clause, deference to prison officials' authority is achieved in part through application of a reasonableness test that is less restrictive than the test ordinarily applied to alleged infringements of fundamental constitutional rights. Lovelace, 472 F.3d at 199 (citing O'Lone, 482 U.S. at 349). Courts look at whether there is a valid, rational connection between the prison regulation or action and the interest asserted by the government; whether alternative means of exercising the right remain open to prison inmates; what impact the desired accommodation would have on prison staff, inmates, and the allocation of prison resources; and whether there exist any obvious, easy, alternatives to the challenged action or regulation, which might suggest that it is not reasonable but is rather an exaggerated response to prison concerns. Turner, 482 U.S. at 89-92 (internal quotations and citations omitted).

Where the court found that Robinson met his burden under RLUIPA of showing that the prohibitions on personal use of candles, a wand, and an oil-diffuser were the least restrictive means of furthering VDOC goals of safety and security, it similarly finds that these prohibitions are reasonably related to legitimate penological interests under the First Amendment. See Dettmer v. Landon, 799 F.2d 929, 934 (4th Cir. 1986) (concluding that security officer's concern about inmate's unsupervised possession of candles and incense was reasonable under the First Amendment) and Abel v. Martel, No. 2:09-cv-1749, 2013 WL

552416 (E.D. Cal. 2013) (finding that no matter the burden placed on the exercise of an inmate's religion, confiscation of a wand did not amount to violation of his First Amendment right because keeping weapons and weapon making material out of the hands of prisoners furthered prison's objective of safety for all).

However, at this stage of the litigation, the court finds that Robinson has not met his burden of showing that the prohibition on personal use of plant-based oils, a small chalice, a small offering bowl, and a small bell, and the communal use of a wand, are rationally related to the legitimate penological interests in safety and security. As discussed above, the requested items are similar in size and material to items already allowed for personal use and, in the case of the wand, for communal use. Accordingly, Dieppa may proceed against Robinson under the First Amendment free exercise clause on these claims.

Robinson's assertion of qualified immunity fails at this time. "Where qualified immunity is at issue, a court must first determine 'whether a constitutional right would have been violated on the facts alleged; [and] . . . second . . . whether the right was clearly established.'" Smith v. Smith, 589 F.3d 736, 739 (4th Cir. 2009) (quoting Saucier v. Katz, 533 U.S. 194, 200 (2001)) (alterations in original). Dieppa bears the burden in the first question and Robinson bears the burden on the second question. See Henry v. Purnell, 501 F.3d 374, 377–78 (4th Cir. 2007). Dieppa met his burden by alleging facts sufficient to support claims under the First Amendment. Robinson, however, failed to "brief, with full supporting authority, why the right was not so clearly established as to put a reasonable official on notice of any legal obligations." Shabazz v. Johnson, No. 3:12CV282, 2015 WL 789200, *12 n.19 (E.D. Va. Feb. 24, 2015). Instead, Robinson only states that he is entitled to qualified immunity

because he did not take any personal action, a claim the court rejects. Because he failed to meet his burden, Robinson is not entitled to qualified immunity at this stage of the litigation.

### (3) Equal Protection

The equal protection clause of the Fourteenth Amendment requires that persons who are similarly situated be treated alike by the government. City of Cleburne v. Cleburne Living Ctr., Inc., 473 U.S. 432, 439-41 (1985). To establish a violation of the Equal Protection Clause, a plaintiff must show that he has been treated differently from others who are similarly situated and that the unequal treatment was intentional or purposeful. If a plaintiff makes such a showing, the court then determines whether the disparity in treatment can be justified under the requisite level of scrutiny. Morrison v. Garraghty, 239 F.3d 648, 654 (4th Cir. 2001).

Dieppa complains that the defendants violated the equal protection clause of the Fourteenth Amendment by denying recognition of Druid holy days while recognizing the holy days of other religious groups. Dieppa asserts that VDOC has approved multiple holy days for other religious groups, ranging from nine holy days for one group to four holy days for another group, with Ramadan lasting for multiple weeks and Chanukah for more than one week. ECF no. 1-1 at 8. See also Master Religious Calendar, ECF No. 18-3 at 7-11.

However, it is not enough to allege that one group has more holy days than another. Without a description of the holy days and their significance to the religion, the court is at a loss to determine whether the groups are similarly situated.

Moreover, Dieppa's implied assertion that all the other religious groups are accorded more holy days than the two days accorded Druidry is false. For example, practitioners of Catholicism/Christianity are accorded two holy days (Christmas and Easter); practitioners of

Humanism also have two holy days (Darwin Day and National Day of Reason); practitioners of Rastafarianism have two days (Haile Selaisse's birthday and Haile Selaisse's coronation); and practitioners of Buddhism have two days (Vesak and Bodhi). Id. Accordingly, Dieppa has failed to state a Fourteenth Amendment claim for violation of his right to equal protection based on the denial of additional holy days and this claim is dismissed.

## CONCLUSION

As set forth above, the court **GRANTS** defendants' motion to dismiss in part and **DENIES** the defendants' motion to dismiss in part, ECF No. 15.

(1) The court **DISMISSES** all claims against Clarke brought under 42 U.S.C. § 1983;

(2) The court **DISMISSES** all § 1983 claims for monetary relief against Robinson in his official capacity;

(3) The court **DISMISSES** claims related to holy days for failure to state a claim under RLUIPA and the equal protection clause of the Fourteenth Amendment;

(4) The court **DISMISSES** all of Dieppa's claims based on the need to practice his religion outside;

(5) The court **DISMISSES** all of Dieppa's claims related to the personal use of a candle in his cell, the personal use of a wand, and the personal or communal use of an oil diffuser;

(6) Dieppa may proceed on his RLUIPA claims for injunctive relief based on the denial of communal use of a wand and personal use of a chalice, an offering bowl, a bell, and plant-based essential oils; and

(7) Dieppa may proceed on his First Amendment claims against Robinson based on the denial of communal use of a wand and personal use of a chalice, an offering bowl, a bell, and plant-based essential oils. Robinson's assertion of qualified immunity is denied without prejudice.

An appropriate order will be entered.

It is so **ORDERED**.

ENTERED: 07—08—2019

/s/ Michael F. Urbanski

Michael F. Urbanski
Chief United States District Judge